Richard J. Cooper, Esq.
Luke A. Barefoot, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the Foreign Representative*
*of Odebrecht S.A. and affiliated debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Odebrecht S.A., *et al.*,[1]<br><br>Debtors in a Foreign Proceeding | Chapter 15<br><br>Case No. 19-12731<br><br>(Joint Administration Pending) |

**VERIFIED PETITION FOR RECOGNITION OF THE**
**BRAZILIAN RJ PROCEEDING AND MOTION FOR ORDER**
**GRANTING RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1515, 1517, AND 1520**

Marcelo Rossini, the foreign representative ("Petitioner" or the "Foreign Representative")

in the jointly-administered judicial reorganization (*recuperação judicial* or "RJ") proceeding (the

"Brazilian RJ Proceeding") of Odebrecht S.A. ("ODB") and its affiliated debtors in these Chapter

15 Cases (collectively, the "Debtors") pending in the First Court of Bankruptcy and Judicial

Recovery of the State of São Paulo (the "Brazilian Court") pursuant to Federal Law 11.101 of

February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of

Brazil ("Brazil"), by and through my undersigned counsel, respectfully submit this *Verified Petition*

*for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief*

---

[1]    The Debtors in these chapter 15 cases (the "Chapter 15 Cases") and the last four identifying digits of the
tax number in the jurisdiction are: Odebrecht S.A., (Brazil – 01-72); Odebrecht Participações e Investimentos S.A.,
(Brazil – 01-00); Odebrecht Finance Ltd., (Cayman – 1323); and ODB International Corporation (Nassau - 8020 B).

*Pursuant to 11 U.S.C. §§ 1515, 1517, and 1520* (the "Verified Petition").  This Verified Petition

is filed in furtherance of the *Official Form Petition* (together with this Verified Petition, the

"Petition") filed contemporaneously herewith and hereby request that the Court enter an order

substantially in the form annexed hereto as Exhibit A (the "Proposed Order") pursuant to sections

1515, 1517, and 1520 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

Code"): (i) commencing a case for each Debtor under chapter 15 ancillary to the Brazilian RJ

Proceeding (the "Chapter 15 Cases"); (ii) granting recognition of the Brazilian RJ Proceeding

pursuant to section 1517 of the Bankruptcy Code as a "foreign main proceeding;" (as defined in

section 1502(4) of the Bankruptcy Code) of each of the Debtors, and all relief included therewith

as provided in section 1520 of the Bankruptcy Code;[2] (iii) recognizing the Petitioner as the "foreign

representative" (as defined in section 101(24) of the Bankruptcy Code) of the Brazilian RJ

Proceeding for each Debtor for purposes of these Chapter 15 Cases; and (iv) granting such other

and further relief as the Court deems just and proper.[3]

In support of this request, the Petitioner relies upon and incorporates by reference: (i) the

*Declaration of Marcelo Rossini in Support of Verified Petition Under Chapter 15 for Recognition*

*of a Foreign Main Proceeding and First Day Pleadings* (the "Rossini Declaration"); and (ii) the

*Declaration of Eduardo Secchi Munhoz In Support of Verified Petition Under Chapter 15 for*

*Recognition of Foreign Main Proceeding* (the "Brazilian Counsel Declaration"); and (ii) the filed

concurrently herewith.  In further support of this Verified Petition, the Petitioner respectfully

represents to the Court as follows:

---

[2]    Alternatively, should the Court decline to recognize the Brazilian RJ Proceeding as the foreign main proceeding for any of the Debtors, the Petitioner respectfully requests that the Court recognize such proceeding as a foreign nonmain proceeding (as defined in section 1502(5) of the Bankruptcy Code) of any such Debtor, and grant appropriate relief.

[3]    In addition, and in separate motions filed contemporaneously herewith, the Foreign Representative is seeking an order directing the joint administration of these Chapter 15 Cases.

## PRELIMINARY STATEMENT

On June 17, 2019 (the "RJ Petition Date"), the Debtors as well as certain affiliates that are not Debtors in these Chapter 15 Cases (collectively, the "RJ Debtors") filed a joint voluntary RJ petition (the "RJ Petition") with the Brazilian RJ Court under the Brazilian Bankruptcy Law. That same day, the Brazilian RJ Court entered an order formally accepting the RJ Debtors into the Brazilian RJ Proceeding (the "RJ Acceptance Order").[4] The RJ Debtors are presently operating their businesses under the judicial supervision of the Brazilian RJ Court.

Debtor ODB, together with its subsidiaries, including certain non-Debtor and non-RJ Debtors entities (collectively, the "ODB Group"), own, operate, and manage one of the largest private business conglomerates in Brazil. Its business enterprise consists, among others, of (i) petrochemicals, (ii) engineering & construction; (iii) oil and gas, (iv) sugar and ethanol, (v) real estate development, (vi) transportation, (vii) energy and (viii) naval services. The ODB Group has its center of main interests in Brazil and, since its inception in 1944, the ODB Group has expanded its operations throughout Brazil including executing a series of infrastructure projects fundamental for regional development. The ODB Group has also expanded beyond Brazil to work on international projects, but the ODB Group's operational and economic activities are primarily concentrated in Brazil.

As described further below, the ODB Group's current financial distress arises from the decline in the Brazilian economy which has impacted the construction and infrastructure industry particularly harshly and severely reduced the availability of credit. Additionally, and at the same time, the Federal Police of Brazil began a criminal investigation (known as "Operation *Lava-Jato*") into allegations of money laundering and corruption which implicated certain key individuals in

---

[4]    A copy of the translated RJ Acceptance Order is attached hereto as Exhibit B.

the ODB Group.  This investigation further increased the ODB Group's difficulty in accessing financing, maintaining existing accounts and winning new business in Brazil and elsewhere.

Unable to meet all their short- and medium-term financial obligations, the Debtors began implementing changes, namely selling certain assets and deleveraging.  The ODB Group has also had productive dialogues with creditors resulting in significant savings in restructured liabilities. The RJ Debtors commenced the Brazilian RJ Proceeding to further this process.  However, the ODB Group remains vulnerable to creditor actions outside of Brazil, including in the United States. Accordingly, the Foreign Representative commenced these Chapter 15 Cases to obtain recognition of the Brazilian RJ Proceeding as a foreign main proceeding with respect to each of the Debtors.

Indeed, Brazil is the proper venue for the main restructuring proceeding of the Debtors, as each maintains its center of main interests in that jurisdiction.  Debtors ODB and Odebrecht Participações e Investimentos S.A. ("OPI") maintain their registered offices is in Brazil.  While Debtors Odebrecht Finance Ltd. ("OFL") and ODB International Corporation ("ODBIC") maintain their registered offices outside of Brazil, the registered-office COMI presumption is easily rebutted given the substantial evidence that their COMI is Brazil.  OFL acts as a financing entity for ODB's operations and as such is inextricable from ODB's Brazilian operations. Additionally, OFL complies both with Brazilian laws and follows Brazilian professional standards. For example, OFL's financial statements are prepared in accordance with 'Brazilian GAAP'. Similarly, ODBIC is as a financing vehicle for primarily Brazilian-based operations and investments.  Both companies are effectively run and operate from the ODB Group's central office in São Paulo, Brazil.

# BACKGROUND

A.    **General Background and History**

       *i.    Overview*

1.    The Debtors are part of the ODB Group, one of the largest private business conglomerates in Brazil which was founded in 1944.  The ODB Group commenced operations as a construction company in the northeastern region of Brazil, and has been involved in the construction of multiple projects such as (i) industrial plants, (ii) warehouses, (iii) small dams, (iv) highways, (v) airports, (vi) ports, (vii) hydroelectric plants, (viii) subways, (ix) buildings and (x) canals.[5]  Throughout its history, the ODB Group has maintained close ties with both the Brazilian private and public sector, winning several bids for contracts with the government and its controlled entities.

2.    Within about 30 years, the ODB Group expanded operations into southern Brazil, concentrating initially on Rio de Janeiro with the construction of Petrobras's headquarters in 1970; Brazil's first nuclear power plant, the Central Nuclear de Angra dos Reis in 1971; the Rio de Janeiro international airport in 1971 and the Rio de Janeiro State University in 1972.  Since then, the ODB Group has expanded its operations throughout Brazil, executing a series of infrastructure projects fundamental for regional development.  These ranged from numerous important highways and railways since the 1970s to, more recently, some of the largest construction projects in Brazil's modern history.  Examples of the latter include the giant Hydroelectric Damn of Belo Monte (which, by itself, employed approximately 30,000 employees in Brazil's developing Northern

---

[5]    As described in further detail below, certain subsidiaries of the ODB Group are not part of the Brazilian RJ Proceeding including Odebrecht Engenharia e Construção S.A. ("OEC") and its subsidiaries which constitute the ODB Group's main business segment which is not subject to the Brazilian RJ Proceeding.  OEC is pursuing a separate restructuring.

region), some stadiums for the 2014 World Cup and some of the main buildings used in the 2016 Olympics.

3.    In the 1980s, the ODB Group diversified its operations and made its first investments in the petrochemical and oil and gas sectors.  During that time, the ODB Group expanded beyond Brazil and began working on international projects, particularly large construction projects in South America.

4.    The ODB Group became one of the largest private business conglomerates in Brazil, employing over 48,0000 people, and one of the largest construction companies in the world. As described in more detail below, the ODB Group's gross revenues more than tripled between 2008 and 2015 to BRL132 billion (approximately $33.06 billion).[6]  However, along with the increase in revenues, the ODB Group's total debt increased more than six fold during the same period to BRL110 billion (approximately $27.55 billion).  During the same period, the macro-economic situation in Brazil was changing, and in mid-2014, the Brazilian economy entered a deep recession.

5.    Despite this expansion abroad, the ODB Group's operational and economic activities remain, to this date, primarily concentrated in Brazil.  Its business enterprise consists, among others, of (i) petrochemicals, (ii) engineering & construction, (iii) oil and gas, (iv) sugar and ethanol, (v) real estate development, (vi) transportation, (vii) energy, and (viii) naval services. The ODB Group is a leader in the engineering & construction sector in Brazil.  In addition to developing technology, creating thousands of jobs and generating value for its stakeholders in the various companies it operates, the ODB Group promotes the general welfare through the Odebrecht Foundation, a private non-profit organization which has helped approximately eleven

---

[6]    Reference to USD conversion herein was calculated using a USD/BRL exchange rate $1 = BRL3.9926, the Federal Reserve USD/BRL rate as of August 16, 2019.

thousand people in two-hundred and sixty communities, directly and indirectly.  It has also worked on social projects that have benefitted approximately seven million people with investments totaling BRL838 million (approximately $209.89 million).

      *ii.    The ODB Group's Corporate Structure and Offices*

6.      The ODB Group's corporate structure reflects its history of financings, expansions, strategic investments, and acquisitions, as well as its corporate strategy of allocating specific operations to different corporate entities.  The chart below shows, in relevant part, a summary of the ODB Group's corporate structure as it pertains to the RJ Debtors and charts the role of each Debtor and related affiliates in the ODB Group:



7.      As shown above, the Debtors and their key related affiliates are composed of:

i.    **The "Holding Company"** - Debtor ODB serves as the ODB Group's holding company.  It is incorporated in Brazil, its registered office is in Brazil and its headquarters are located in Salvador, Bahia, Brazil.  It coordinates activities, makes strategic decisions and fosters the development of the ODB Group.

ii.    **The "Investment Entity"** - Debtor OPI is a Brazilian-incorporated investment management company, responsible for consolidating risk intelligence and participation in negotiations, concessions and biddings for the benefit of different divisions of the ODB Group.  Its registered office is in Brazil and its headquarters are located in São Paulo, São Paulo, Brazil.

     iii.    **The "<u>Financing Entities</u>" -** Debtors OFL and ODBIC were incorporated outside of Brazil solely in order to enable the borrowing of foreign currency resources. OFL's registered office is located at a law firm that provides trust services in the Cayman Islands and its headquarters are located in São Paulo, Brazil. ODBIC's registered office is located at a trust services company in Nassau, the Bahamas and its headquarters are located in São Paulo, Brazil. As explained in more detail below, neither of these entities has material assets and they have no employees or operations located in their jurisdictions of incorporation. They were both SPVs formed solely for the purpose of enabling financing for members of the ODB Group. Both entities are dependent on Brazilian entities to repay their obligations and on officers and employees located in Brazil to make decisions and carry out their operations.

8.    As shown above, the ODB Group is an economically and operationally integrated global group, whose joint operational activities are principally focused on Brazil and subject to Brazilian laws and regulations. Indeed, the ODB Group's primary operational activities are in Brazil, as is its primary operational management center, located in São Paulo, Brazil (the "<u>São Paulo Office</u>"). All four Debtors share the same officers, all of whom are Brazilian citizens, are based in São Paulo and hold Brazilian passports. The four officers include Luciano Nitrini Guidolin, Daniel Bezerra Villar, Maurício Dantas Bezerra and Mônica Bahia Odebrecht. The São Paulo Office maintains staff in charge of operational matters, including senior management, as well as the ODB Group's legal, human resources, finance, and communication teams. Additionally, a majority of the ODB Group's total gross revenue is generated from Brazilian client groups including 57% in 2016, 54% in 2017 and 59% in 2018.

9.    The ODB Group also maintains operational bases in other locations across Brazil, including, but not limited to, Salvador in the state of Bahia, Rio de Janeiro in the state of Rio de Janeiro, São José dos Campos in the state of São Paulo, and in Brasilia, Federal District. As part of the ODB Group's global engineering and construction businesses, other subsidiaries of the ODB Group have offices in countries such as Guatemala, Cuba, Chile, Bolivia, Spain, Portugal, Luxembourg, Netherlands, and Austria (the "<u>ODB Foreign Offices</u>"). The ODB Foreign Offices

are managed by local management teams reporting to senior management located in Brazil, and none of any such ODB Foreign Offices is an office of any of the Debtors. Similarly, senior management of other ODB Group foreign entities, with the exception of certain technical staff members, are not based in any foreign jurisdiction and do not provide treasury/financial services to any of the RJ debtors.

10.     As of June 17, 2019, the **ODB Group** employed over 48,000 individuals, with the vast majority (approximately 65.9%) located in Brazil. Its strong employee base is essential to preserving operational stability, safety, and efficiency, which, in turn, are necessary to maximize and maintain the value of the Debtors over the course of the Brazilian RJ Proceeding.

11.     The Debtors are parties to a *de facto* corporate group, with concentrated control emanating from the São Paulo office. Economically, the various debtor companies that comprise the ODB Group have a strong financial interconnection in terms of management, financial transfers, obtaining financing and the granting of cross-guarantees. As discussed in more detail below, the financing agreements entered into by the companies within the ODB Group generally involve the granting of guarantees by several companies, and the allocation of resources is determined in accordance with a business logic that is unitary and coordinated with the interests and priorities established in a consolidated fashion.

      *iii.*    *Chapter 15 Debtors*

      a.  ODB

12.     ODB is an entity organized under the laws of Brazil with its registered office in Salvador, Brazil. ODB is a non-operational holding company for the ODB Group and participates in all of the ODB Group's business segments through one or more of its subsidiaries. ODB is also a guarantor of a significant portion of the ODB Group's indebtedness. As of June 17, 2019, ODB

employs only 0.19% of the ODB Group's total workforce including individuals in management, finance, human resources, legal, communication, corporate and administrative staff, and compliance functions, with all of those employees working in Brazil. All of ODB's employees, directors and officers are based in Brazil and all decisions are made in Brazil, where its board meetings are also held. The vast majority of its operating contracts are governed by Brazilian law.

### b.  OPI

13.  OPI is an entity organized under the laws of Brazil with its registered office in São Paulo, Brazil. At its core, OPI started out as a business incubator for new business ventures and currently OPI manages some of ODB Group's investments. It manages corporate investments and processes information and data for negotiations, concessions, offerings and other transactions for the benefit of the ODB Group. Its board meetings are held online with Brazilian directors generally participating from Brazil. All of its directors and officers are based in Brazil and all decisions are made in Brazil. OPI does not have any direct employees.

### c.  OFL

14.  OFL is a special-purpose financing entity organized under the laws of the Cayman Islands, and performs activities in the Cayman Islands to comply with corporate and other applicable laws and regulations of the Cayman Islands, including the maintenance of its registered office in George Town, Grand Cayman, Cayman Islands. OFL's sole business activity is to act as a financing vehicle to raise funds for the ODB Group's operations. The net proceeds from these financings have been used primarily for the ODB Group's general corporate purposes, including additional equity investments made in its subsidiaries and expansion into different sectors. OFL does not negotiate directly with companies outside the ODB Group and the funds raised through OFL's financings have been invested under ODB's direction into the many sectors in which the

ODB Group operates. OFL is entirely dependent on other entities (especially revenue from the ODB Group) to repay its obligations.

15.     OFL has no employees of its own and decisions regarding OFL's activities are made and executed in Brazil. Although, OFL is organized and has its registered office in the Cayman Islands, OFL's Cayman address is, in practice, a P.O. Box at a law firm that provides trust services. As such, OFL does not maintain a physical office or any employees in the Cayman Islands. Moreover, the four officers, discussed above, who are all Brazilians, have never been to the Cayman Islands for the purpose of OFL business. Instead, board meetings are held virtually from Brazil. OFL's financial statements are prepared in accordance with Brazilian accounting rules and audited by Brazilian auditors and OFL uses a local branch of Banco do Brasil to maintain its bank accounts. Additionally, the various indentures OFL is a party to (described further below) are guaranteed by OEC and/or Construtora Norberto Odebrecht S.A. ("CNO"), both Brazilian entities, controlled, directly and indirectly, respectively, by ODB.

> d.  ODBIC

16.     ODBIC is the financial hub for some of the ODB Group's international transactions and ODBIC controls OFL. ODBIC is a holding company and does not have any employees and does not negotiate with counterparties outside the ODB Group as it is only party to intercompany loans. It is organized under the laws of the Bahamas and performs activities in the Bahamas to comply with corporate and other applicable Bahamian laws and regulations, including the maintenance of its registered office in Nassau, the Bahamas. ODBIC does not run any operations from the Bahamas and its registered address in the Bahamas is that of its legal representative, MB&H Corporate Services Ltd., not a physical office of ODBIC. ODBIC's only bank accounts are held by the Nassau branch of the Brazilian bank Itaú BBA. Its four board members are all

Brazilian citizens, as noted above, and have never met in the Bahamas on ODBIC business. Instead, the Brazilian board members meet virtually from Brazil.

**B.    The ODB Group's Operations and Assets**

  *i.    General Overview*

17.    The Debtors, along with other entities of the ODB Group, manage corporate investments in the ODB Group's business segments.  They are therefore responsible for the ODB Group's debt and granting guarantees on the financing acquired by their subsidiaries for the benefit of the ODB Group, as well as consolidating the result of the operational performance of the entities. Therefore, the guarantees granted and the financing taken and guaranteed by the RJ Debtors are conditioned and interconnected to the activities of the parent companies, including ODB.  The following is a brief summary of the assets and operations of each business segment in which the RJ Debtors participate.

  *ii.    Non-Chapter 15 Debtors*

18.    Construction Division.  OEC and its subsidiaries, which are not RJ Debtors, constitute the ODB Group's main business segment which is not subject to the Brazilian RJ Proceeding.  OEC has been responsible for major construction projects in Brazil including the a new São Paulo metro line, the Rio de Janeiro State University Campus, and the Baixo Igauçu Hydroelectric Plant.

19.    Petrochemicals Division.  The RJ Debtors Odebrecht Serviços e Participações S.A. ("OSP") and OSP Investimentos S.A. ("OSP INV") are entities created to hold the ODB Group's holding in Braskem S/A, a joint venture with the Brazilian government's Petrobras, and currently the largest producer of thermoplastic resins in the Americas.  The petrochemical sector is strategic and, has proved to be successful.  As a result, the ODB Group's holdings in Braskem is one of the

ODB Group's most important assets in its recovery efforts. OSP and OSP INV are incorporated in Brazil and their headquarters are located in São Paulo.

20.     <u>Sugar and Ethanol Division</u>. The RJ Debtor ATVOS Agroindustrial Investimentos S.A. ("<u>ATVOS INV</u>") concentrates the ODB Group's investments in the production, import, export and commercialization of agricultural products, with a focus on the cultivation, industrialization and commercialization of sugar cane for the production of sugar, ethanol and derivatives. ATVOS INV is incorporated in Brazil and its  headquarters are located in São Paulo.

21.     <u>Shipyard Division.</u>  Odebrecht Participações e Engenharia S.A. ("<u>OPE</u>") is the investment management company that holds the ODB Group's interests in Enseada Indústria Naval S.A. ("<u>Enseada</u>"), a company that operates in the offshore shipbuilding services. OPE is incorporated in Brazil and its  headquarters are located in Salvador.

22.     <u>Properties Division.</u>  The RJ Debtors Odebrecht Properties Investimentos S.A. ("<u>OPINV</u>"), Odebrecht Properties Parcerias S.A. ("<u>OPP</u>"), OP Centro Administrativo S.A. ("<u>OP Centro</u>"), OP Gestão de Propriedades S.A. ("<u>OP Gestão</u>") and Edifício Odebrecht RJ S.A. ("<u>EORJ</u>") were established to work on the development of public and private business real estate projects, hotel services and building management, and public infrastructure projects. OPINV, OPP and OP Gestão are incorporated in Brazil and their headquarters are located in São Paulo. OP Centro is incorporated in Brazil and its headquarters are in Brasília. EORJ is incorporated in Brazil and its headquarters are in Rio de Janeiro.

23.     <u>Energy Division.</u>  The RJ Debtors Odebrecht Energia Investimentos S.A. ("<u>OEI</u>"), Odebrecht Energia S.A. ("<u>OE</u>"), Odebrecht Energia Participações S.A. ("<u>OEPAR</u>") and Odebrecht Energia do Brasil S.A. ("<u>OEBR</u>") hold the ODB Group's investments in the energy sector, and are responsible    for    the    direct    or    indirect    exploration    of    the    electricity    generation    and

commercialization businesses in various modalities, including alternative sources.  OEI, OE, OEPAR, and OEBR are incorporated in Brazil and their headquarters are located in São Paulo.

24.    <u>Defense Division.</u> The RJ Debtor Mectron – Engenharia Indústria e Comércio S.A. ("<u>Mectron</u>") is the company acquired by the ODB Group when it had plans to invest in the strategic defense sector, developing technologies and products for military and civil use that contribute to the Brazilian technological autonomy and to the Brazilian armed forces.  Mectron is incorporated in Brazil and its headquarters are in São José dos Campos.  Currently, the ODB Group has no further interest in this sector.

    *iii.*    *Chapter 15 Debtors*

    a.  ODB

25.    In 2018, ODB's gross revenue, generated through the many subsidiaries controlled by ODB, totaled approximately BRL86.3 billion ($21.61 billion), with 58.8% of this revenue originating from the ODB Group's Brazilian clients.  ODB's main assets are the interests it holds in the ODB Group's subsidiaries which operate in a variety of segments such as those described above.  Nearly 100% of those direct equity interests are located in Brazil.  ODB also holds a bank account located in New York with BNY Mellon.

    b.  OPI

26.     OPI's main assets are the shares it holds in dozens of ODB Group entities located in Brazil and abroad, including in Peru, Colombia, Austria, Spain and Mexico.  The shares of OPI itself are registered in OPI's corporate records (*Livro de Registro de Ações*) which is held at the ODB Group's headquarters in São Paulo, Brazil.

c.  OFL

27.    Over 99% of OFL's assets are eleven intercompany credits against ODB Group

entities and of those, over 99% by value are against Brazilian companies of the Group.  Its largest

asset is an intercompany credit in the amount of BRL2.02 billion (approximately $505.93 million)

owed by ODBINV S.A. ("ODBINV").  ODBINV directly owns ODB and directs the operations

of the whole ODB Group whose operations are centered in Brazil.  The intercompany credits arise

from operational cash flow from the engineering and construction business.  Currently any assets

or proceeds held by OFL are held with Banco do Brasil's local branch.

d.  ODBIC

28.    ODBIC's main asset are intercompany credits against ODB Group entities.  Of

these intercompany credits, over 61.5% of the credits by value are against Brazilian-based ODB

Group companies.  ODBIC's additional assets include shares in OFL and ODBIC's bank accounts

at the Nassau branch of the Brazilian bank Itaú BBA with a $15.6 million balance composed of (i)

disbursements of an intercompany loan and (ii) cash collateral released from a certain project.[7]  The

total amount it holds in intercompany credits is BRL1.03 billion (approximately $257.97 million).

Additionally, the shares of ODBIC itself are held at the ODB Group's headquarters in São Paulo,

Brazil.

**C.**    **Capital Structure**

*i.*    *General Overview*

29.    The ODB Group's controlling structure is composed of layers of different holding

companies, culminating with members of the Odebrecht family, as well as a minority participation

held by other shareholders, including an entity and individuals.  Specifically, ODB's shares are

---

[7] Balance as of June 17, 2019.

held entirely by ODBINV.  ODBINV's shares, for their part, have another holding company called Kieppe Participações e Administração Ltda. ("KIEPPE") holding 59.03% of ODBINV stock, while a remaining 40.97% is held by minority shareholders.  KIEPPE is in turn controlled by yet another holding company (Kieppe Patrimonial S.A.), whose stock is divided among the holding companies of the members of the Odebrecht family.  This information is synthesized in the chart below:



30.    As of the RJ petition date, the RJ Debtors were liable for total financial indebtedness of approximately BRL67.4 billion (approximately $16.88 billion) (including accrued interest) under various international bonds, debentures, direct loans and bank credit facilities.  Of this, BRL48.8 billion (approximately $12.22 billion) is subject to the Brazilian RJ proceeding and BRL338 million (approximately $84.66 million) consists of secured claims.

31.     Many of the Debtor's debt facilities contain cross-default provisions, early maturity clauses, and covenants, where a default on one debt facility would create an enormous aggregate liability and a significant impact on all subsidiaries.

32.     Additionally, the Debtors have operating debts owed to employees and trade creditors, most of whom are located in Brazil, which are generally subject to the Brazilian RJ Proceeding, as well as certain intercompany debt obligations (as the ODB Group is a financially integrated enterprise).

ii.     *Chapter 15 Debtors*

a.   ODB

33.     By the end of 2018, ODB's consolidated net debt was BRL82.5 billion ($20.66 billion).  ODB's net debt outstanding relates to its own direct debt, as well as guarantees granted by  ODB to the debt of several of its subsidiaries through various debentures, banking credit facilities and sureties.  All of ODB's own debt (100%) is owed to creditors located in Brazil.  Additionally, most of the debt guaranteed by ODB is owed to creditors located in Brazil.

b.   OPI

34.      In July 2019, 2018, OPI's total direct debt was BRL$623 ($156.05 million), and all of OPI's direct debt is owed to creditors located in Brazil.

c.   OFL

35.     OFL is party to just two types of contracts: note indentures and certain intercompany loans.  As of June 17, 2019, OFL had an aggregate outstanding principal amount of $3,093 million in notes, being (1)  $525.5 million of notes due 2029, (2) $544.6 million of notes due 2025, (3) $792.7 million of perpetual notes, (4) $105.8 million of notes due 2023, (5) $150.2 million of notes due 2022, (6) $898.5 million of notes due 2042 and (7) $76.0 million of notes due

2020 (together, the "OFL Notes").  As noted above, all of the OFL Notes are guaranteed by OEC and/or CNO which are both Brazilian entities, controlled, directly and indirectly, respectively, by ODB.    Pursuant to the terms of the OFL Notes' offering documents, the creditors of OFL have always been fully on notice that any restructuring of their obligations could take place in Brazil and their investment was made with the expectation their purchases would be repaid with revenues earned largely in Brazil from operations largely subject to Brazilian legal and regulatory regimes. Additionally, OFL's obligations to creditors derive their creditworthiness and expectations of repayment from revenue earned largely in Brazil from Brazilian client groups.  The OFL Notes themselves consistently make reference to Brazilian rules, regulations, institutions and other Brazilian  concepts.  For instance, the address provided for notices to OFL is the ODB Group's address in São Paulo.  Moreover, the notice provisions provide that notices sent to OFL (as the issuer) are deemed delivered to OEC and CNO as guarantors as well.  Moreover, the definitions outlined in the OFL Notes' introductory clauses are filled with examples of Brazilian elements. The definition of "Bankruptcy Law" in each of the OFL Notes references Brazilian Bankruptcy Law as well as US and Cayman law.  "Reference Banks", for instance, means Brazilian banks. The Brazilian Securities Commission (*Comissão de Valores Mobiliários*) is defined and with regard to noticing, the issuer is required to comply with applicable Brazilian law and regulations issued by the *Comissão de Valores Mobiliários*.  "Brazilian Corporate Law" is defined as Brazilian Federal Law No. 6.404/76, as amended.  The definition of "GAAP" in most OFL Notes references primarily Brazilian accounting rules.  Although, these OFL Notes are governed by New York law, New York is elected as a "non-exclusive" forum for dispute resolution.  Moreover, the attorneys-in-fact signing the OFL Notes are Brazilian and in certain OFL Notes the same attorneys-in-fact sign for both OFL and CNO.

36.     OFL is also a party to various intercompany loans.  These loans account for approximately 26% of the liabilities on its balance sheet.  Its most significant long-term liability, however, is the financing of the OFL Notes, whose financing accounts for over 71% of total liabilities.

### d.  ODBIC

37.     ODBIC is the obligor on four intercompany loans owed to each of Aqueduct Trading Services CO. INC, Odebrecht Overseas Ltd., OCS International Ltd. and Odebrecht Latinvest S.A.  The net debt owed by ODBIC is BRL382 million (approximately $95.67 million) and ODBIC is entirely dependent on entities of the ODB Group to repay its obligations.

**D.     Events Precipitating Commencement of the Brazilian RJ Proceeding**

*i.     General Economic Conditions in Brazil*

38.     Between 2008 and 2015, the gross revenues of the ODB Group jumped from BRL 40 billion (approximately $10.02 billion) to BRL132 billion (approximately $33.06 billion) per year.  As a result, the number of jobs generated by the ODB Group also increased, the number of employees increased from eighty-two thousand to one hundred and twenty-eight thousand in the same period, reaching a peak of one hundred and ninety-three thousand in 2013.  A growth of this magnitude, in a short period of time, required raising significant capital.  The ODB Group's main business operations, civil construction and infrastructure, required an adequate financing structure. In addition, the development of numerous other sectors in the ODB Group at the time, such as the Agroindustrial, Properties, Energy, Defense, Infrastructure, and Investments Divisions, also required high amounts of capital.

39.     The ODB Group received financing from national and international public and private financial institutions, as well as the national and international capital markets.  As a result, between 2008 and 2015, the ODB Group's total debt increased from BRL18 billion (approximately

$3.89 billion) to BRL110 billion (approximately $27.55 billion). However, around mid-2014, the Brazilian economy entered a recession. Consequently, the public sector and private sector severely reduced their demand for construction projects and infrastructure. A combination of political instability, record governmental budget deficits, and a contracting economy chilled foreign investment in Brazil and froze the Brazilian capital markets. Public financial institutions, which had been traditional financiers of technology and infrastructure operations, reduced the availability of credit. Similarly, private institutions were more conservative in their allocation of new financing.

*ii. Operation Lava-Jato*

40.    At the same time, the Federal Police of Brazil began Operation *Lava-Jato* into allegations of money laundering and corruption. Certain key individuals in the ODB Group were implicated in the investigation which led to increased difficulty in accessing financing and new business in Brazil and elsewhere. In addition, counter-parties terminated or suspended a number of contracts for infrastructure works abroad, large payments due to the ODB Group for completed projects were withheld, and various new projects were temporarily shut down. Moreover, Operation *Lava Jato* also impacted the ODB Group indirectly. For example, Sete Brasil, a shipping company which had ordered twenty-eight ships from the ODB Group's Shipyard Division, cancelled all its orders after it was also caught-up in its own Operation *Lava Jato* investigation which culminated in its filing for reorganization. This severely curbed the activities and capital structure of the Shipyard Division.

41.    Since the beginning of the investigation, the ODB Group has made significant investments in the areas of compliance, employee training, and ethical development. The ODB Group cooperated with the investigators and entered into numerous agreements with the Brazilian

government and other regulatory bodies.  In December 2016, ODB signed an agreement with the Federal Public Ministry ("MPF") of Brazil, the United States Department of Justice ("DOJ") and the Swiss Attorney General's Office, under which the ODB Group agreed to pay an aggregate amount of BRL3.83 billion (approximately $959.27 million) over twenty-three years.  In July 2018, the ODB Group signed an agreement with the Brazilian Federal Comptroller General's Office ("CGU Federal") and the Attorney General's Office ("AGU"), in which it undertook to pay BRL2.72 billion (approximately $681.26 million) to the Federal Government of Brazil and to all the injured entities, including various public sector entities, over twenty-two years.  These payments have already been partially made – for instance, the ODB Group has already paid $93 million to satisfy the obligations undertaken before the DOJ and no further payments are owed to US authorities.

42.    In addition, seven other leniency and cooperation agreements were signed by ODB Group entities with the governments of Brazil, Ecuador, Guatemala, Panama, the Dominican Republic and Switzerland.  More recently, an agreement with the World Bank was signed in December 2018, a collaboration agreement was signed with the Public Prosecutor of Peru in February 2019, and an agreement was signed with the Brazilian antitrust authorities ("CADE") in April 2019.

43.    Despite attempts to normalize and continue operating business in the ordinary course, due to the recent political and financial crises and the consequences of Operation *Lava Jato*, the ODB Group's liquidity and resources were severely strained.  The ODB Group continued to experience difficulties in obtaining new financing, especially from public financial institutions. The ever-increasing cost of credit and the load of relevant contingent liabilities, including due to

Operation *Lava Jato*, also made the ODB Group's access to private resources more restricted in the capital and financial markets.

### iii.    *Restructuring Underway and Future Outlook*

44.    Despite having valuable assets, the RJ Debtors did not have the liquidity to meet all their short- and medium-term financial obligations.  The ODB Group began implementing changes to overcome this crisis, namely selling certain assets and deleveraging.  It has implemented a program in recent years to assess value of certain assets and sell them, with the goal of reducing financial exposure on certain projects and increasing its cash position in order to honor its financial commitments. These sales amounted to more than BRL7.2 billion (approximately $1.80 billion) over the last three years.

45.    Moreover, since July 2016, certain ODB Group entities have engaged in productive dialogues with creditors, resulting in restructured liabilities of approximately BRL27 billion (approximately $6.76 billion).  For example, Ocyan S.A. ("Ocyan"), a subsidiary within the ODB Group and a pioneer in exploration, drilling and production of offshore oil and gas, maintenance and underwater construction services, successfully implemented an out-of-court restructuring plan.

46.    Through the Brazilian RJ Proceedings, the ODB Group is fully convinced that it now has the opportunity to adapt its activities to the current reality by improving and concentrating its efforts on certain economic activities and optimizing the allocation of investments.

47.    The ODB Group expects that as the Brazilian economy improves, it will be able to create new value in the national and international markets.  The ODB Group is well positioned to take advantage of new investments and projects and remains a national and global leader in the infrastructure, engineering, and construction sectors.

**E.**     **The Current Brazilian RJ Proceeding**

48.     Faced with BRL48.8 billion in prepetition debt[8] that they are unable to pay, the RJ
Debtors began the Brazilian RJ Proceeding on June 17, 2019.  The Brazilian Court accepted the
application on the same day by way of order, attached in English as <u>Exhibit B</u>.  In the same order,
the Brazilian Court ruled it was competent to oversee all Odebrecht cases and consolidated all such
proceedings.[9]  The order also suspended all actions and/or executions in progress against the RJ
Debtors including any executions against the RJ Debtors' assets.  The Brazilian Court also granted
a provisional injunction, whereby it classified certain shares owned by the ODB Group in other
related companies (e.g. Braskem) as critical to the RJ's success.[10]  Lastly, the order addressed
other RJ formalities, such as appointing the Judicial Administrator and instructing which
notifications were to be issued.

49.     Pursuant to the resolutions of appointment (the "<u>Resolutions</u>"), the Foreign
Representative, with respect to each of the Debtors, has been (i) appointed to act as the foreign
representative of the Brazilian RJ Proceeding for such Debtor for purposes of these Chapter 15
Cases and (ii) authorized to commence these Chapter 15 Cases with respect to such Debtor as the
foreign representative of the ODB Group in connection with this Chapter 15 Case.  True and
correct copies of the Resolutions appointing the Foreign Representative are attached hereto as
<u>Exhibit C</u>, <u>Exhibit D</u>, <u>Exhibit E</u> and <u>Exhibit F</u>.

---

[8]     As of year-end 2018, the ODB Group's balance sheet indicated a total debt of approximately BRL$95
billion (approximately $23.79 billion).

[9]     *See* Declaration of Brazilian Counsel ¶ 8; Exhibit B at 4601–4602 (explaining the factors for jurisdiction
similar to U.S. COMI analysis).

[10]     The Appellate Court for the State of São Paulo has suspended this provisional injunction and the issue is up
for further appeal.

F.    **Connections to the United States**

50.    Each of the Debtors have property in the United States.  ODB holds property in New York in a bank account with BNY Mellon.  OFL holds property in New York in a bank account with Banco do Brasil.  Additionally, Cleary Gottlieb Steen & Hamilton LLP holds a certain unused retainer from all the Debtors in a bank account located in New York, New York in connection with certain legal services retained in respect of these Chapter 15 Cases.

51.    ODB and OFL are also currently party to certain litigation proceedings and an arbitration in the United States.  Specifically, <u>Washington State Investment Board v. Odebrecht S.A.</u>, (Case No. 17-08118) and <u>DoubleLine Capital LLP et al. v. Odebrecht Finance Ltd. et al.</u>, (Case No. 17-04576) are pending in the United States District Court for the Southern District of New York, and <u>José Carlos Grubisich v. Odebrecht S.A.</u>, (ICDR Case No. 01-19-0001-3512), an arbitration pending in New York and administered by the International Centre for Dispute Resolution.  These matters are described in further detail below in paragraph 55.

## JURISDICTION AND VENUE

52.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 1501 as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, <u>In re Standing Order of Reference Re: Title 11</u>, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "<u>Amended Standing Order</u>").

53.    These Chapter 15 Cases have been properly commenced with respect to each of the Debtors in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by the filing of the Verified Petition.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

54.    Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) as the principal U.S. assets of each of the Debtors are located within New York County and thus within this District.

## <u>REQUIRED DISCLOSURES</u>

55.     The Petitioner hereby provides the following disclosures in accordance with Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"):

- the following disclosure identifies for the Court any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of each of the Debtors' equity interests:

    a.  100% of ODB's equity is directly owned by ODBINV.

    b.  ODBINV is owned by the following entities in the percentages reflected:

        ▪ KIEPPE (59.03%)

        ▪ Graal Participações Ltda. (20.65%)[11]

        ▪ the remaining shares held by minority shareholders.

    c.  KIEPPE is 100% controlled by another holding (Kieppe Patrimonial S.A.), whose stock is divided among the holding companies of the members of the Odebrecht family. These entities along with their holdings in Kieppe Patrimonial S.A are:

        ▪ Riocon Patrimonial (21.71%);

        ▪ NO. Jr. Patrimonial (21.87%);

        ▪ IPQ Patrimonial (21.87%);

        ▪ EAO Patrimonial (18.91%); and

        ▪ CAPE Patrimonial (15.64%)

- Other than the Verified Petition, none of the Debtors has a pending petition with this Court for relief under any chapter of the Bankruptcy Code.

- The Brazilian RJ Proceeding is the only foreign proceeding, as that term is defined in section 101(23) of the Bankruptcy Code, of the Debtors presently open at the time of commencement of these Chapter 15 Cases.

---

[11]     Graal Participações Ltda.'s holdings are currently under judicial dispute.

- Aside from the Petitioner with respect to these Chapter 15 Cases (and Eduardo Secchi Munhoz ("the <u>Brazilian Counsel</u>") with respect to the Brazilian RJ Proceeding), no other persons are presently authorized to administer foreign proceedings of the Debtors at this time.

- ODB and OFL are currently party to certain litigation and an arbitration in the United States. The pending cases/arbitration are:

  a. <u>Washington State Investment Board v. Odebrecht S.A.</u>, (Case No. 17-08118): ODB and OFL (the "<u>ODB Defendants</u>") are parties to this litigation pending in the United States United States District Court for the Southern District of New York (the "<u>District Court</u>"). Commenced on October 20, 2017, the Washington State Investment Board (the "<u>Board</u>") asserts claims arising from alleged untrue statements in the offering memoranda relating to several notes of which the Board claims to be a holder. The Board seeks damages, reimbursement of reasonable costs and expenses incurred in the action, and further relief as determined by the court. On April 20, 2019, the ODB Defendants filed a motion to dismiss. The plaintiffs have yet to reply and the District Court has yet to order oral arguments or a pretrial conference. On August 20, 2019, the plaintiffs wrote a letter to the District Court arguing that the litigation should proceed absent recognition of these Chapter 15 Cases. The District Court entered an order on August 22, 2019 requiring the ODB Defendants to respond by August 26, 2019. In accordance with that order, counsel for the ODB Defendants will inform the District Court of the filing of these Chapter 15 Cases and their impact on the pending litigation.

  b. <u>DoubleLine Capital LLP et al. v. Odebrecht Finance Ltd. et al.</u>, (Case No. 17-04576): ODB is a party to this litigation pending in the United States District Court for the Southern District of New York. Commenced on September 1, 2017, DoubleLine Capital LLP and various other parties (collectively, the "<u>DoubleLine Plaintiffs</u>") assert claims arising from alleged untrue statements in the offering memoranda relating to several notes of which the DoubleLine Plaintiffs claim to be holders. The DoubleLine Plaintiffs seek damages to be determined at trial. The DoubleLine Plaintiffs amended their complaint twice and after the court dismissed certain claims without prejudice, the DoubleLine Plaintiffs filed a third amended complaint. ODB has filed a motion to dismiss. The DoubleLine Plaintiffs filed an opposition to the motion to dismiss on January 1, 2019, and ODB filed a reply on February 13, 2019, the court has yet to schedule oral arguments or a pretrial conference.

  c. <u>José Carlos Grubisich v. Odebrecht S.A.</u>, (International Centre for Dispute Resolution Case No. 01-19-0001-3512): ODB is a party to this arbitration pending in New York and administered by the International Centre for Dispute Resolution. Commenced on April 30, 2019, José Carlos Grubisich (the "<u>Claimant</u>') seeks damages in an amount to be determined by the arbitrator but in no event less than $4,381,880 plus all interest accrued

thereon.  ODB filed an answer on June 11, 2019, which it intends to amend. The arbitrator set a deadline of September 6, 2019 for ODB to submit its amended answer.  No hearing date has been set.

## BASIS FOR RELIEF REQUESTED

56.     The  Court  should  grant  the  Verified  Petition  and  recognize  the  Brazilian  RJ Proceeding as the foreign main proceeding for each of the Debtors.  Chapter 15 of the Bankruptcy Code  was  specifically  designed  to  assist  foreign  representatives  such  as  Petitioner  in  the performance of his duties.  A central goal of Chapter 15 is to "provide effective mechanisms for dealing  with  cases  of  cross-border  insolvency  while  promoting  international  cooperation,  legal certainty,  fair  and  efficient  administration  of  cross-border  insolvencies,  protection  and maximization of debtors' assets, and the rescue of financially troubled businesses."  Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127, 132 (2d Cir. 2013) (citing 11 U.S.C. § 1501(a)) (internal quotations omitted).  Each of the procedural requirements of section 1515 of the Bankruptcy Code are satisfied, as is set out in section A below.  Notably, the Petitioner is the duly appointed "foreign representative" of the Brazilian RJ Proceeding with respect to each of the Debtors, and it is well-established that Brazilian RJ proceedings are considered "foreign proceedings" for the purposes of chapter 15.  Further, the center of main interests for each of the Debtors is clearly in Brazil given the vast majority of the Debtors' operations have taken place and remain in Brazil.

57.     Further, from a pragmatic perspective, Brazil is the sole jurisdiction in which the Debtors' businesses can be comprehensively and efficiently restructured—a restructuring effort on which the jobs of over 48,000 individuals depend.  Indeed, as noted above, the very purpose of chapter 15 is to incorporate the Model Law on Cross-Border Insolvency (1997) (the "Model Law") to provide effective mechanisms to handle cross-border insolvencies.  See 11 U.S.C. § 1501(a).

This case is a paradigmatic example of a global enterprise that requires chapter 15 relief to facilitate a logical and efficient coordination of restructuring efforts.  The rational hub of those turnaround efforts is Brazil—the locus of the ODB Group's operational center and where the ODB Group's restructuring process is pending.

58.    In the alternative, while the Petitioners are confident that the Brazilian RJ Proceeding is a foreign main proceeding within the definition of section 1502(4), if this Court declines to recognize the Brazilian RJ Proceeding as the foreign main proceeding of any of the Debtors, those Debtors are eligible for non-main recognition and relief, on the basis set out in section C below, to ensure a comprehensive restructuring of the ODB Group.

A.    **The Brazilian RJ Proceeding is a Foreign Proceeding of each of the Debtors and the Petitioner is the Duly-Authorized Foreign Representative thereof and has Properly Petitioned This Court for Recognition**

59.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding if (i) the petition meets the requirements of section 1515 of the Bankruptcy Code, (ii) the foreign representative applying for recognition is a person or body, and (iii) such foreign proceeding is a foreign main proceeding or non-main proceeding within the meaning of section 1502 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a); In re Inversora Eléctrica de Buenos Aires S.A., 560 B.R. 650, 653 (Bankr. S.D.N.Y. 2016).  These foregoing requirements are satisfied with respect to the Brazilian RJ Proceeding, the Petitioner, and the Verified Petition with respect to each of the Debtors.

*i.    The Verified Petition satisfies the requirements of section 1515*

60.    Each of the procedural requirements of section 1515 of the Bankruptcy Code are satisfied.  First, the Petitioner properly commenced these Chapter 15 Cases with respect to each of the Debtors in accordance with sections 1504 and 1509(a) by filing the Verified Petition under

section 1515.  See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,

374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (hereinafter "Bear Stearns I"), aff'd, 389 B.R. 325

(S.D.N.Y. 2008) (hereinafter "Bear Stearns II").  Second, the Petitioner has submitted all documents

and other information required by section 1515(b) regarding the Brazilian RJ Proceeding and the

appointment of the Petitioner as foreign representative thereof with respect to each of the Debtors

for purposes of these Chapter 15 Cases, together with English translations of the same where

applicable, as required by section 1515(d).[12]  Finally, the Petitioner has submitted in this Verified

Petition all information required by section 1515(c) (i.e., a statement by the Petitioner identifying

any other foreign proceedings known to the Petitioner with respect to each of the Debtors), together

with all other required disclosures regarding each of the Debtors in accordance with Bankruptcy

Rules 1007(a)(4) and 7007.1.  See supra ¶ 55.

> ii.    The Petitioner is the duly-appointed "foreign representative" of the Brazilian
>        RJ Proceeding for each of the Debtors

61.    Section 1517(a) of the Bankruptcy Code also requires that a foreign representative

applying for recognition be a person or body.  See 11 U.S.C. § 1517(a)(2).  Here, the Petitioner is

an individual, which is included in the term "person," 11 U.S.C. § 101(41), who, with respect to

each of the Debtors has been duly (i) appointed to act as the foreign representative of the Brazilian

RJ Proceeding for such Debtor for purposes of these Chapter 15 Cases and (ii) authorized to

commence these Chapter 15 Cases with respect to such Debtor.  As explained in the Brazilian

Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Debtors to administer the

reorganization of their assets and affairs and run its business during the course of the RJ proceeding.

Brazilian Counsel Decl. ¶ 15.  Each of the Debtors' boards appointed the Petitioner in conjunction

---

[12]    The resolutions of appointment for each debtor are attached as Exhibit C, Exhibit D, Exhibit E, and Exhibit F to
the Rossini Declaration.

with the Brazilian RJ Proceeding for such Debtor, and thus sections 101(24) and 1517(a)(2) of the Bankruptcy Code are satisfied.  See In re Serviços de Petróleo Constellation S.A., 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) (finding a foreign representative appointed pursuant to resolution of the Debtors' boards is a proper "foreign representative" within the meaning of section 101(24) and thus meets 1517(a)(2)'s requirements); Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Oi S.A., Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; In re OAS S.A., 533 B.R. 83, 93-95 (Bankr. S.D.N.Y 2015) (holding that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative).[13]

### iii.  The Brazilian RJ Proceeding is a foreign proceeding

62.     The Brazilian RJ Proceeding is a "foreign proceeding" with respect to each of the Debtors, as required under section 1517(a).  See 11 U.S.C. § 1517(a)(1) (requiring as a condition to the entry of a recognition order, the Brazilian RJ Proceeding must be a foreign main proceeding or nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code).  A "foreign proceeding" is (1) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court, and (4) for the purpose of reorganization or liquidation.  See 11 U.S.C. § 101(23).  The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  11 U.S.C. § 1502(3).  The Brazilian RJ Proceeding meets this definition.

---

[13]     See also Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.), 470 B.R. 408 (Bankr. N.D. Tex. 2012), aff'd, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican concurso proceeding, which contemplates self-management by the debtor during the proceeding similar to that of a debtor-in-possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the individual as the foreign representative).

63.     First, as discussed in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding is a "collective" proceeding in that it involves the treatment of multiple creditors and claims together rather than attempting to resolve two-party disputes.  See Brazilian Counsel Decl. ¶ 6.  Furthermore, an RJ restructuring plan, is intended to directly or indirectly benefit all creditors collectively and must be approved by a required majority of each class of claims.  Id. ¶ 24.  The Brazilian RJ Proceeding is a proceeding pending in Brazil, a foreign country, where the assets and affairs of the Debtors are subject to the control and supervision by the Brazilian RJ Court for purpose of reorganization or liquidation.  See id. ¶¶ 7, 28.  Furthermore, it is well established by this Court that restructuring proceedings under the Brazilian Bankruptcy Law (and other Brazilian restructuring laws) constitute "foreign proceedings."  See, e.g., Serviços de Petróleo Constellation, 600  B.R. at 270 ("Courts in this Circuit have long agreed that the Brazilian RJ process satisfies these standards"); In re Oi S.A., ( Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; In re OAS S.A., 533 B.R. at 83.  The same conclusion applies here.

## B.  **The Court Should Find that the Brazilian RJ Proceeding Is a "Foreign Main Proceeding" with Respect to Each of the Debtors**

64.     The Brazilian RJ Proceeding is also the "foreign main proceeding" of each Debtor because it is pending in Brazil, which is each Debtor's center of main interests ("COMI").  See 11 U.S.C. § 1502(4); 11 U.S.C. § 1517(b)(1) (a foreign main proceeding is the foreign proceeding subject to the petition "pending in the country where the debtor has the center of its main interests").

> i.     *A COMI analysis under U.S. law focuses on where a debtor's business interests are principally centered*

65.     Neither the Bankruptcy Code nor the Model Law defines COMI.  However, there is a rebuttable presumption that a debtor's COMI is its "registered office."  11 U.S.C. § 1516(c). However, where any "evidence to the contrary" is presented, the presumption has no role to play

and the Court must "examine all of the evidence to determine where [debtor's] center of main

interest lies." Collins v. Oilsands Quest, Inc., 484 B.R. 593, 595 (Bankr. S.D.N.Y. 2012).

66.      A COMI analysis looks at the debtor's substantive "locus of operations"—the

center of its operations, purpose, function, and activities, among others. See Phoenix Four, Inc. v.

Strategic Res. Corp., 446 F. Supp. 2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and

quotations omitted). Some courts interpret COMI to mean "principal place of business" to guide

their COMI analysis. See e.g, In re Millennium Global Emerging Credit Master Fund Ltd., 458 B.R.

63 (Bankr. S.D.N.Y. 2013). However, the Second Circuit has noted "[g]iven Congress's choice to

use COMI instead of "principal place of business," that concept [of principal place of business] does

not control the analysis. But to the extent that the concepts are similar, a court may certainly consider

a debtor's "nerve center," including from where the debtor's activities are directed and controlled."

See In re Fairfield Sentry Ltd., 714 F.3d 127, 138 n.10 (2d Cir. 2013).

67.      A COMI analysis must be performed on an entity-by-entity basis. See In re Oi

Brasil Holdings Cooperatief U.A., 578 B.R. 169, 206 (Bankr. S.D.N.Y. 2017) (noting that the

chapter 15 regime "require[s] COMI inquiries for each debtor entity rather than for collective

corporate groups"); Serviços de Petróleo Constellation, 600  B.R. at 279 ("COMI must be

determined on a company-by-company basis"). However, the Court should still take into account

a debtor's integration into and function within an integrated corporate group, particularly where the

debtor is a special-purpose vehicle ("SPV") and/or has no function independent from that of its

group. See OAS S.A., 533 B.R. at 101-02 (COMI analysis for a foreign SPV included consideration

of its participation in a larger corporate group).

68.      Courts in this Circuit employ a list of factors adopted from In re SPhinX, Ltd., 351

B.R. 103, 117 (Bankr. S.D.N.Y. 2006) when determining a debtor's COMI where the "registered

office" presumption does not govern.  These factors are nonexclusive and are not to be applied

mechanically.  <u>Serviços de Petróleo Constellation</u>, 600 B.R. at 273.  They include:

> "[T]he location of the debtor's headquarters; the location of those
> who actually manage the debtor (which conceivably could be the
> headquarters of a holding company); the location of the majority
> of the debtor's creditors or a majority of the creditors who would
> be affected by the case; and/or the jurisdiction whose law would
> apply to most disputes." . . . [the] "principal place of business" . . .
> [and] the expectations of third parties [as to the] debtor's COMI."

<u>Fairfield Sentry</u>, 2011 U.S. Dist. LEXIS 105770 at *10 (citing <u>Bear Stearns II</u>, 389 B.R. at 336);

<u>In re SPhinX, LTD.</u>, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).  The Second Circuit added as

additional possible factors "the location of headquarters, decision-makers, assets, creditors, and the

law applicable to most disputes."  <u>Fairfield Sentry</u>, 714 F.3d at 130.  These factors, the Second

Circuit reasoned, are "in the public domain" and thus "ascertainable and not easily subject to

tactical removal."  <u>Id.</u> at 136-38 (noting the "importance of factors that indicate regularity and

ascertainability"); <u>see also British Am.</u>, 425 B.R. at 912 (finding that the "location of a debtor's

COMI should be readily ascertainable by third parties").

   69.  While each of the <u>Fairfield Sentry</u> factors serves as a "helpful guide" in assessing

a debtor's COMI, no one factor is required or dispositive.  <u>See Fairfield Sentry</u>, 714 F.3d at 137

(noting that "[c]onsideration of these specific factors is neither required nor dispositive" and

warning against a mechanical application of the factors).  The factors should be applied in light of

pragmatic considerations for the "maximization of the debtor's value" and "the reasonable interests

of parties in interest," as well as creditors' support for or acquiescence to a proposed COMI

"because their money is ultimately at stake."  <u>SPhinX</u>, 351 B.R. at 117.

ii.   *A COMI analysis for SPVs serving a larger corporate group is specially
tailored*

70.     Consistent with a flexible and pragmatic approach to recognition, courts have

tailored their COMI analyses across a wide range of facts and circumstances.  When determining

the COMI for an SPV that is integrated with and exists only in the context of a larger corporate

group, such as a holding or financing entity, courts focus the COMI analysis on those particular

considerations most indicative of this specialized entity's "real seat."  See Bear Stearns I, 374 B.R.

at 128; Serviços de Petróleo Constellation, 600  B.R. at 279 (noting "ultimate aim of the [COMI]

analysis is to locate the "real seat" of each of the Chapter 15 Debtors.").

71.     Courts begin with a query into the SPV's role within and integration to the larger

corporate group.  See OAS S.A., 533 B.R. at 101 (observing that the Austrian SPV "had no other

business except to pay [the notes] off," and adding that "the Brazilian [b]ankruptcy [p]roceedings

provide the only realistic chance to repay [those] [n]otes"); see also Oi Brasil, 578 B.R. at 226-227

(stating that the Dutch SPV's COMI lay in Brazil where the SPVs had "no operations or business

independent of the Oi [g]roup and [were] operated within the Oi [g]roup as part of a single, integrated

economic unit . . .").

72.     SPVs may be considered substantially integrated for the purposes of a COMI

analysis in the following situations: (i) when they have no direct employees, own no operational

assets, or do not have revenue-generating operations or business of its own, as in the case of

specialized holding or financing companies; (ii) where they belong to and exist only with reference

to a larger corporate group with integrated operations, customers, corporate teams, marketing,

research, development, strategy, human resource management, and administrative activities; and/or

(iii) where the group is financially integrated and interdependent as a result of intercompany loans

and cross-company guarantees.  See id. at 227 (finding that the COMI of a Dutch SPV lay in Brazil

with its corporate group where it was "managed from the principal executive office of Oi in Rio de Janeiro, Brazil" and its only functions were limited to borrowing, issuing, or assuming notes and on-lending to the [debtor] [g]roup).

73.     Even where foreign SPVs maintain registered offices in, have directors living in, hold board meetings in, and are individually directed from their jurisdictions of organization, courts have still considered the entity's corporate reality as a part in a larger, more complex organization. See id. at 177 (concluding that the Dutch SPV in question had its COMI in Brazil even though it "file[d] financial statements with the Dutch Chamber of Commerce. . . pa[id] taxes in the Netherlands. . . file[d] tax returns with Dutch authorities in the Netherlands. . . ha[d] retained various professionals and advisors in the Netherlands. . ." and had an employee in the Netherlands); see also OAS S.A., 533 B.R. at 101 (stating that while the Austrian SPV's registered office was located in Austria and the SPV satisfied the "services required under Austrian law," the SPV had no other business beyond borrowing and lending and thus its COMI lay in Brazil with that of its corporate group).

74.     Second, courts in the Second Circuit evaluating the COMI of an SPV focus special attention on the expectations of the debtor's creditors.  While creditor expectations can factor in to a COMI analysis for all debtors—see Fairfield Sentry, 714 F.3d at 130, 137—they are particularly significant for financing SPVs.  For example, in both Oi Brasil and OAS, the investors in the bonds issued by the SPV entities were advised in the offering memoranda and/or debt documentation that the entities had substantial connections in Brazil and thus, the creditors assumed the risks of investing in a Brazilian enterprise. Oi Brasil, 578 B.R. at 228-29 (finding that the offering materials and indentures for the notes issued by the Dutch SPV made clear that "any chance of repayment stems from the revenue-producing operations in Brazil"); OAS, 533 B.R. at 103 (noting that

purchasers of the notes issued by the Austrian SPV "expected to receive repayment from the cash generated by the operations of the [corporate group], and in the event of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding").

> iii.   *Substantial evidence across the ODB Group structure shows that each of the Debtors has its COMI in Brazil*

75.      Each of the Debtors in these Chapter 15 Cases has its center of main interests in Brazil.  The vast majority of the Debtors' operations have historically taken place and remain in Brazil, are performed primarily in Brazil by Brazilian-citizens.  Although the foreign-incorporated Debtors maintain their registered offices outside of Brazil, the registered-office COMI presumption is easily rebutted and should be afforded no weight given the substantial evidence to the contrary.

76.      While the ODB Group has expanded its operations to other jurisdictions, its principal economic activity has been and continues to be in Brazil.  To be sure, each of the foreign-incorporated Debtors has a minimal presence and complies with corporate, tax, and other laws in its jurisdiction of incorporation, but such presence does not outweigh the substantial evidence that the COMI of these Debtors is in Brazil.  For instance, the São Paulo Office coordinates the operational management of the ODB Group (including for OFL and ODBIC) with staff in charge of operations-related finances, employees, investor relations, finance, and communications.  See supra ¶ 8.  The São Paulo Office also coordinates the day-to-day activities of the ODB Group.  These activities speak to the existence of a shared, centralized COMI for all of the Debtors as a part of their fully integrated, shared activities.  See British Am., 425 B.R. at 911 (the location of business functions such as "financial, administrative, marketing, information technology, investment, and legal functions" speak to the location of COMI).

77.      Additionally, as noted above, what constitutes the business operations of each Debtor, and accordingly the principal place of those business operations, depends on the type of

business operations in which that Debtor engages.  British Am., 425 B.R. at 911.  Here, all of the

business functions of the foreign-incorporated Debtors serve functions that are inextricable from

the Debtors' Brazilian-centered operations, further tying those Debtors to the group and their shared

COMI in Brazil.  OFL and ODBIC are "part of, and inseparable from, [its corporate] group in

Brazil."  OAS, 533 B.R. at 103.  Each serves the ODB Group in the capacity as a financing

company, and each is dependent on the ODB Group to pay back its creditors.  Moreover, none of

these entities runs its own operations completely independent of those of the ODB Group.  As such,

most of the traditional factors courts rely on to identify a debtor's COMI are inapplicable to these

entities.  See  id. at 101; see also Oi Brasil, 578 B.R. at 225-32.

> iv.  *Entity-specific factors also show that each of the Debtors has its COMI in Brazil*

78.    ODB is the ODB Group's non-operational holding company and has its registered

office in Brazil and its headquarters in Salvador, Brazil.  The "registered office" presumption under

11 U.S.C. § 1516(c), provides that ODB's COMI is in Brazil based on the location of its registered

office.  There is no relevant evidence to rebut this presumption and an evaluation of the hallmark

factors in a COMI analysis, as discussed above under In re SPhinX and Fairfield Sentry, further

supports the presumption and a finding of ODB's COMI in Brazil.  The location of those who

actually manage ODB is Brazil.  All of ODB's employees and officers are located and work in

Brazil.  See supra ¶ 12.  Brazil is the jurisdiction whose law would apply to most disputes as ODB's

operating contracts are mainly governed by Brazilian law.  Id.  Nearly 100% of ODB's assets,

including interests it holds in the ODB Group's subsidiaries, are located in Brazil.  See supra ¶ 25.

All of ODB's own debt owed to creditors is located in Brazil and most of the debt guaranteed by

ODB is owed to creditors located in Brazil. See supra ¶ 33.  Additionally, ODB utilizes and benefits

from the operational coordinating activities of the ODB Group's São Paulo Office and ODB is subject to Brazilian legal and regulatory regimes. See supra ¶ 8.

79.    OPI, is the investment entity for the ODB Group and has its registered office in Brazil and its headquarters are located in São Paulo, Brazil. The "registered office" presumption under 11 U.S.C. § 1516(c), provides that ODB's COMI is presumed to be Brazil and an analysis of the In re SPhinX and Fairfield Sentry factors relevant to a COMI determination further supports the presumption. There is no relevant evidence that OPI's COMI is anywhere but Brazil. While, OPI does not have any direct employees, all four of its officers are based in Brazil and all decisions with regard to OPI's management of corporate investments and information processing are made in Brazil. See supra ¶ 13. All of OPI's direct debt is owed to creditors located in Brazil. See supra ¶ 34. The shares of OPI itself are registered in OPI's *Livro de Registro de Ações* which is held at OPI's head office in São Paulo. See supra ¶ 26. Additionally, OPI is subject to Brazilian legal and regulatory regimes. See supra ¶ 8.

80.    OFL is a financing entity of the ODB Group with its registered office in George Town, Grand Cayman, Cayman Islands. The registered office COMI presumption under 11 U.S.C. § 1516(c) is easily rebutted given the substantial evidence that OFL's COMI is Brazil. First, turning to the location of the entity's decision makers as noted in Fairfield Sentry, OFL's registered office in the Cayman Islands is merely a P.O. Box established by a law firm that provides trust services. See supra ¶ 15. Decisions involving OFL are not made from the Cayman Islands and it is notable that none of OFL's four officers, who, as noted above, are all Brazilians, have ever been to the Cayman Islands for the purpose of OFL business. Id. The OFL board of directors meets virtually from Brazil. Id. Second, the vast majority (99%) of OFL's assets are intercompany credits against ODB Group entities and of those, over 99% are against Brazilian companies of the Group. See

*supra* ¶ 27.   And as noted above, OFL's largest asset is an intercompany credit in the amount of BRL2.02 billion (approximately $519.3 million) owed by ODBINV, an entity centered in Brazil which directly owns ODB and directs the operations of the whole ODB Group.  Id.    Additionally, OFL's assets are tied to Brazil in that any proceeds from the intercompany credits or through OFL's note issuances are invested under ODB's direction in entities within the ODB Group.   Moreover, any remaining assets or proceeds are held by OFL with Banco do Brasil.  Id.

81.     Additionally, both OFL's integration into the ODB Group and the expectations of OFL's creditors indicate that OFL's COMI is Brazil.  As noted above, in a COMI analysis involving an SPV, this Court looks to the SPV's role and integration into the larger corporate group.  Here, OFL is a special purpose financing entity that has no employees of its own and does not own operational assets.  See supra ¶ 15.   Second, as this Court found persuasive in Oi, an SPV is considered substantially integrated into the group where the SPV exists only with reference to the larger corporate group and is financially integrated/interdependent on the group as a result of intercompany loans and cross-company guarantees.   See Oi Brasil, 578 B.R. at 277.   OFL exists only with reference to the ODB Group and OFL's sole business activity is to act as a financing vehicle to raise funds for the ODB Group's operations. See supra ¶ 14.   Moreover, OFL is financially integrated and interdependent on the ODB Group and is party to just two types of contracts: indentures and certain intercompany loans.  See supra ¶ 35.   OFL had an aggregate outstanding principal amount of $3,093 million in notes and OFL is entirely dependent on other entities or revenue from the ODB Group to repay its obligations.  Id.  This Court has recognized that the registered office presumption is rebuttable where an entity seeking Chapter 15 recognition is a "financing vehicle…dependent on the [Debtor Group's] operations for repayment of [its] debts… and payment of [its] debts was entirely reliant on a successful Brazilian restructuring of the

[Debtor Group] as a whole." <u>Oi Brasil,</u> 578 B.R. at 210.  Similarly, here, OFL is dependent on a successful restructuring of the ODB Group to repay its debts.

82.    A finding that OFL's center of main interests is located in Brazil also aligns with the expectations of creditors under the terms of the OFL's prepetition notes.  OFL does not negotiate directly with companies outside the ODB Group.  Creditors of OFL have always been fully on notice that any restructuring of their obligations would take place in Brazil and these creditors lent with the expectation their investments would be repaid with revenues earned largely in Brazil from operations largely subject to Brazilian legal and regulatory regimes.  Moreover, if creditors sought payment on the notes they would have to look to the guarantors OEC and/or CNO, both Brazilian entities, controlled, directly and indirectly, respectively, by ODB.  This is significant as this Court has noted that creditors will look to the location of guarantors for repayment.  <u>See Oi Brasil,</u> 578 B.R. at 228 ("any chance of repayment stems from the [guarantor's] revenue-producing operations in Brazil, not an empty financing vehicle in the [foreign jurisdiction]").  Here, creditors would not look to OFL in the Cayman Islands but rather the guarantors and ODB Group revenues in Brazil.

83.    The notes to which OFL is a party consistently make reference to Brazilian rules, regulations, institutions and other Brazilian concepts.  For instance, the address provided for notices to OFL is the ODB Group's address in São Paulo.  <u>See supra</u> ¶ 35.  Moreover, the notice provisions provide that notices sent to OFL (as the issuer) are deemed delivered to OEC and CNO as guarantors as well.  <u>Id</u>.  This Court encountered similar facts in OAS where the notes issued by a special purpose financing vehicle required that notices under the indenture had to be sent to the special purpose financing vehicle's guarantors in Brazil and notice was not required to be sent to the registered office of the special purpose financing vehicle in Austria.  <u>OAS S.A.,</u> 533 B.R. at 102.  Additionally, here, within the OFL Notes, there are repeated references to Brazil.  To quote but a

few examples of references to Brazil, the definition of "Bankruptcy Law" in every note references Brazilian Bankruptcy Law as well as US and Cayman law. <u>See supra</u> ¶ 35.    The definition of "Reference Banks" means Brazilian banks. <u>Id.</u> OFL is required to comply with applicable Brazilian law and regulations issued by the Brazilian Securities Commission (*Comissão de Valores Mobiliários*). <u>Id</u>. The definition of "GAAP" in most of the OFL Notes references primarily Brazilian accounting rules as set out under "Brazilian Corporate Law". <u>Id.</u> Although, these notes are governed by New York law, New York is elected as a "non-exclusive" jurisdiction. As this Court noted in <u>OAS S.A.</u>, the governing law of a series of notes is not dispositive and is subordinate to the expectation of purchasers of the notes. <u>OAS S.A.</u>, 533 B.R. at 103 (noting that despite notes issued by a special purpose financing vehicle being governed by New York law, the purchasers' expectation of receiving repayment from revenues generated by the operations of the debtor group located in Brazil was more material to a COMI determination).  Moreover, here the attorneys-in-fact signing the OFL Notes are Brazilian and in certain OFL Notes the same attorneys-in-fact sign for both OFL and CNO, further highlighting the connection to Brazil. <u>See supra</u> ¶ 35.

84.    ODBIC is a holding company that enables the borrowing of foreign currency resources for the ODB Group and is the financial hub for part of the ODB Group's operations. <u>See supra</u> ¶ 16. ODBIC's registered office is in Nassau, the Bahamas.  However, the registered office COMI presumption under 11 U.S.C. § 1516(c) is easily rebutted given the substantial evidence that ODBIC's COMI is Brazil.  First, the location of ODBIC's decision makers as noted in <u>Fairfield Sentry</u>, is Brazil and not the Bahamas.  ODBIC does not even maintain a physical office in the Bahamas as its "registered office" is simply that of its legal representative, MB&H Corporate Services Ltd. <u>Id</u>.  ODBIC's own shares are held at the ODB Group's headquarters in São Paulo. <u>See supra</u> ¶ 28.  Additionally, ODBIC does not run any operations from the Bahamas and ODBIC's

four officers have offices in São Paulo and have never even been to the Bahamas on ODBIC business.  Id.  With regard to the location of assets, also noted as a COMI factor in Fairfield Sentry, the majority of ODBIC's assets are located in Brazil or are connected to Brazil.  ODBIC's main asset are intercompany credits worth BRL1.03 billion (approximately $264.8 million) against ODB Group entities.  Of these intercompany credits, over 61.5% of the credits are against Brazilian-based ODB Group companies.  See Supra ¶ 28.  While ODBIC's only bank accounts are held in Nassau – they are held by the Nassau branch of the Brazilian bank Itaú BBA.  Id.

85.    As a holding company, ODBIC does not have employees, does not directly own operational assets, and does not have revenue-generating operations or business of its own.  As noted in Oi Brasil, courts will consider a holding company's role in a larger group where the holding company is financially integrated and interdependent on the group.  Oi Brasil, 578 B.R. at 226-227; OAS S.A., 533 B.R. at 101-02.  Here, ODBIC is only party to intercompany loans within the ODB Group which are governed by Brazilian law or Bahamian law.  ODBIC has no separate, ascertainable presence in the Bahamas and would not have a function outside the ODB Group.  ODBIC is entirely dependent on entities of the ODB Group to repay its obligations.  Moreover, creditor expectations favor COMI in Brazil as ODBIC is the obligor on four intercompany loans and the net debt owed by ODBIC is real-denominated in the amount of BRL382 million (approximately $95.67 million).  See Supra ¶ 37.  ODBIC's creditors under the intercompany loans would only expect repayment of such obligations through ODBIC's connection to the ODB Group.

**C.  In the Alternative, the Court Should Find that the Brazilian RJ Proceeding is at Least a Foreign Nonmain Proceeding of each of the Debtors and Grant Discretionary Relief**

86.    As demonstrated above, the Brazilian RJ Proceeding should be recognized as the "foreign main proceeding" of each of the Debtors.  Nevertheless, should this Court conclude that the Brazilian RJ Proceeding is not the foreign main proceeding of any of the Debtors, the Foreign

Representative submits that, in the alternative, the Brazilian RJ Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtors pursuant to section 1517(b)(2) of the Bankruptcy Code, and that discretionary relief should be granted, namely, the application of a protective stay to the full extent set forth in section 362 with respect to any such Debtors and their U.S.-located property. 11 U.S.C. §§ 1517(b)(2), 1521(a)(6).

> i.   *The factors for recognition of foreign nonmain proceedings under U.S. law*

87.    Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if the debtor has an "establishment" in the foreign country where the proceeding is pending. Establishment is defined in Chapter 15 as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).  Unlike COMI, chapter 15 provides no evidentiary presumption as to whether a debtor has an establishment in a particular jurisdiction. Bear Stearns II, 389 B.R. at 338.  Thus, whether an establishment exists in a particular location is "essentially a factual question," id. at 338, and the petitioner bears the burden of proof.  British Am., 425 B.R. at 915.

88.    The Bankruptcy Code does not define "nontransitory economic activity," and, as this Court has noted, "[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15." Millennium Glob., 458 B.R. at 84.  Courts have interpreted the meaning of "establishment" in the context of the purpose of chapter 15 and the Model Law, and by looking to the meaning ascribed to such term by foreign courts.  See, e.g., Millennium Glob., 458 B.R. at 84 n.49; Bear Stearns I, 374 B.R. at 131 n.12.  The limited number of U.S. courts to consider the question have determined a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise carries out a nontransitory economic activity in that jurisdiction.  See, e.g., Fairfield Sentry, 2011 U.S. Dist. LEXIS 105770 at *29-30 n.8 (describing an establishment as "a local place of

business"); <u>Bear Stearns I</u>, 374 B.R. at 131; <u>Creative Fin.</u>, 543 B.R. at 520; <u>British Am.</u>, 425 B.R. at 916.  Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." <u>Millennium Glob.</u>, 458 B.R. at 85.  A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," <u>Creative Fin.</u>, 543 B.R. at 520; <u>British Am.</u>, 425 B.R. at 915 (same), evidenced by, among other things, "engagement of local counsel and commitment of capital to local banks." <u>Millennium Glob.</u>, 458 B.R. at 85.

> ii.  *Each of the Debtors has an establishment in Brazil and therefore qualifies for foreign nonmain recognition*

89.    If the Court were to find that Brazil is not the COMI for any of the Debtors, the Court should still find that such Debtor has an establishment in Brazil for purposes of chapter 15 recognition.  The Petitioner submits that the foregoing evidence in support of finding that the COMI of each of the Debtors is in Brazil also provides sufficient evidence that each of the Debtors has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction.

> iii.  *The Court should grant the discretionary relief requested for any Debtor granted nonmain recognition*

90.    If the Court finds that the Brazilian RJ Proceeding is a nonmain proceeding with respect to any of the Debtors, then the Petitioner requests that the Court grant discretionary relief with respect to such Debtor and its U.S. located property pursuant to section 1521 of the Bankruptcy Code.  See <u>Serviços de Petróleo Constellation</u>, 600  B.R. at 293 ("Debtors who are recognized as participating in foreign nonmain proceedings may be afforded nearly identical relief as those recognized as operating in foreign main proceedings.").  The Petitioner submits that the foregoing

evidence concerning the Debtors and their integral role within the ODB Group justifies such discretionary relief which is critical for the maintenance of the status quo and the preservation of the Debtors' going-concern value.

91.     To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).  Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31, Pt. 1, at 116.  A determination of sufficient protection requires a balancing of the respective parties' interests.  CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); see In re Toft, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").

92.     Here, the balance of interests weighs in favor of granting the relief requested.  First, recognition and the application of the stay will allow for the efficient and orderly administration of the Debtors' assets and affairs in a centralized, organized proceeding, thus protecting the interests of creditors and maximizing the value of assets.  Such relief will help ensure equitable distribution of assets and prevent certain opportunistic creditors from circumventing the Brazilian RJ Proceeding and commencing actions in the United States at the expense of the broader process.

93.     Furthermore, interested parties will have the ability to participate in the Brazilian RJ Proceeding and assert their claims therein along with all similarly situated creditors.  As set forth in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding affords significant procedural protections to creditors and other stakeholders to ensure a fair and equitable process by providing many of the same procedural safeguards present in chapter 11 of the Bankruptcy Code.  See

Brazilian Counsel Decl. ¶¶ 15, 17-27.  The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian RJ Proceeding, where each creditor's right to be heard will remain unaffected.  Nor will the requested stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for "cause."  See generally 11 U.S.C. § 362(d).  Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Brazilian RJ Proceeding.  Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

## NOTICE

94.     Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in Exhibit G annexed hereto (the "Notice List").  The Petitioner has filed an *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for an Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* [ECF No. 8] and will provide such other or further notice as the Court directs in accordance with the order entered on that motion.

## NO PRIOR REQUEST

95.     No previous request for the relief requested herein has been made to this or any other court.

## CONCLUSION

96.     WHEREFORE, the Petitioner respectfully requests that the Court: (i) grant the Verified Petition and enter the Proposed Order annexed hereto as Exhibit A recognizing the Brazilian RJ Proceeding as the foreign main proceeding for each of the Debtors and granting the requested relief in connection therewith; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  August 26, 2019
        New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: /s/ Luke A. Barefoot
    Luke A. Barefoot

Richard J. Cooper, Esq.
Luke A. Barefoot, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999
(lbarefoot@cgsh.com)

*Attorneys for the Foreign Representative of
Odebrecht S.A. and its affiliated debtors*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Marcelo Rossini, declare  under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of each of the Debtors with respect to the Brazilian RJ Proceeding for purposes of these Chapter 15 Cases.  I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto, are true and accurate to the best of my knowledge, information and belief, and I respectfully represent as follows:

- I am a Treasury Financial Director at the Odebrecht group (the "<u>ODB Group</u>").

- On August 22, 2019, each of ODB, OPI and OFL, and on August 26, 2019, ODBIC, among other things, (i) appointed me as the foreign representative of the Brazilian RJ Proceeding for such Debtor and authorized me to file the Verified Petition and to act on its behalf in these Chapter 15 Cases (each, a "<u>Resolution of Appointment"),</u> and (ii) authorized the commencement of the Brazilian RJ Proceeding and these Chapter 15 Cases with respect to such Debtor (all such resolutions and other authorizations or consents, collectively, together with the Resolutions of Appointment, the "<u>Resolutions</u>").  Accordingly, I am fully authorized and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon: (a) my review of relevant information, data and documents (including oral information) furnished to me by the ODB Group (as defined above) and its legal advisors; (b) information supplied to me by the Debtors' officers, directors, employees and professionals; or (c) my analyses of the information I have received on the Debtors' operations and financial condition.  I have also been kept abreast of major discussions with stakeholders, including the ODB Group's primary financial creditors and its shareholders.  I am an individual over the age of 18.  If I am called to testify, I will do so competently and based on the facts set forth herein.

Dated: <u>August 26, 2019_____</u>

Respectfully Submitted,


<u>/s/ Marcelo Rossini_____</u>
Marcelo Rossini, Financial Director at ODB
and Authorized Foreign Representative of
the Debtors